UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————

| | | |
|---|---|---|
| In re | : | |
| | : | |
| CAIRNS & ASSOCIATES, INC. | : | Chapter 11 |
| | : | Case No. 05-10220 (MG) |
| Debtor. | : | |
| ———————————————————————— | : | |
| | : | |
| CAIRNS & ASSOCIATES, INC. | : | |
| | : | |
| Plaintiff, | : | Adv. Pro. No. 05-1486 |
| | : | |
| - v - | : | |
| | : | |
| CONOPCO, INC. | : | |
| | : | |
| Defendant. | : | |

————————————————————————

**MEMORANDUM OF OPINION**

**A P P E A R A N C E S :**

SEIDEN WAYNE LLC
*Attorneys for Plaintiff Cairns & Associates, Inc.*
70 East 55th Street
New York, New York 10022
        By:    David W. Phillips, Esq.

HERRICK, FEINSTEIN LLP
*Attorneys for Conopco, Inc.*
2 Park Avenue
New York, New York 10016
        By:    William R. Fried, Esq.
               Joshua J. Angel, Esq.
               Matthew S. Hawkins, Esq.

**MARTIN GLENN,**
**United States Bankruptcy Judge**

The plaintiff Cairns & Associates, Inc. (the "Debtor") commenced this adversary proceeding against defendant Conopco, Inc. ("Unilever") to recover $1,183,613.00 for claims for breach of contract, quantum meruit and promissory estoppel stemming from non-payment for public relations services rendered for three Unilever brands – Snuggle, Pond's and Vaseline Intensive Care Lotion ("VICL"). Unilever asserts that the Debtor has failed to satisfy all of the necessary elements to each of these claims, asserts the affirmative defense of accord and satisfaction, and contends that the Debtor's claims are barred by the doctrines of waiver and/or estoppel. Unilever also counterclaims for $550,647, plus interest, that was advanced as prepaid money to the Debtor for manpower and out-of pocket expenses for certain public relations campaigns that were allegedly not used by Cairns on Unilever's programs.

The Court conducted a five-day trial from April 30, 2007 to May 4, 2007. Thereafter, the parties submitted post-trial briefs, and on August 1, 2007, the Court heard closing arguments. The following constitute the Court's findings of facts and conclusions of law pursuant to FED. R. CIV. P. 52(a) made applicable to this adversary proceeding by FED. R. BANKR. P. 7052. For the reasons provided below, the Court holds that (1) of all of the Debtor's affirmative claims set forth in the amended Complaint (the "Complaint"), the Debtor is only entitled to recover $75,000 under Count Three of the Complaint and (2) Unilever is entitled to recover $406,153 on its counterclaim less the $75,000 awarded to the Debtor under Count Three.

## I.    JURISDICTION

The Court has jurisdiction to hear this adversary proceeding pursuant to 28 U.S.C.
§§ 157 and 1334, and under the July 10, 1984 "Standing Order of Referral of Cases to
Bankruptcy Judges" of the United States District Court for the Southern District of New
York (Ward, Acting C.J.). This is a core proceeding pursuant to 28 U.S.C. §
157(b)(2)(I). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.    BACKGROUND

### A.    The Parties

The Debtor was founded in 1981 by Annemarie Cairns ("Cairns"). Pretrial Order,
Undisputed Facts ¶ 1. The Debtor was a full service public relations agency specializing
in strategic consumer marketing communications, business-to-business cause marketing,
special events, brand equity and brand image. Pretrial Order, Undisputed Facts ¶ 2.
Unilever is a wholly-owned subsidiary of Unilever United States, Inc. Pretrial Order,
Undisputed Facts ¶ 3. There are three Unilever brands at issue in this case, Snuggle,
Pond's and VICL (each individually a "Brand" and collectively, the "Brands"). Pretrial
Order, Undisputed Facts ¶ 14.

### B.    The Debtor as Agency of Record

The Debtor began representing Chesebrough-Pond's ("CPUSA"), the predecessor
to Unilever, in 1988, representing three brands, Aziza, Prince Matchabelli and Q-Tips.
1T:16.[1] Unilever bought Chesebrough-Pond's in 1987. PX 507 at p. 44.

---

[1]    The trial transcript consists of 7 volumes: 1) April 30, 2007 morning session; 2) April 30, 2007
afternoon session; 3) May 1, 2007 session; 4) May 2, 2007 session; 5) May 3, 2007 early session; 6) May 3,
2007 late session; and 7) May 4, 2007 session. References to the trial transcript appear as "[Day]T[Page]."

The Debtor entered into a signed contract to become agency of record (an "AOR" Agreement") for CPUSA in 1992. 1T:18; PX 503. The CPUSA AOR Agreement made the Debtor the agency of record for designated brands of CPUSA. 1T:18-19, PX 503.[2] An "Agency of Record" ("AOR") is a firm that has signed a contract with a client and has become the exclusive agency on behalf of the client. 1T:16-17. The client divulges internal marketing and business secrets to the firm, and the firm signs a confidentiality agreement. *Id.* In addition, the firm agrees not to represent any competitive brands. *Id.* In exchange, the firm would not be required to pitch the business year after year, and should the relationship conclude there is generally a written notice and notification. *Id.* For example, the CPUSA AOR Agreement required 60 days' notice of non-renewal otherwise it would automatically renew year-to-year. PX-503, § 1.1.

From 2001-2003, the relevant time frame, the Debtor was also an agency of record for Unilever. 5T:108-109. However, unlike the Debtor's arrangement with CPUSA, the Debtor and Unilever did not have a formal AOR Agreement. Although the Debtor testified that there was a contract signed in 1997 or 1998 between Unilever and Cairns, *see* 2T: 72, this contract was not produced by the Debtor in the discovery phase of this litigation. *Id.* at 73. In fact, Cairns testified that the document was placed into storage and was likely "inadvertently thrown out." *Id.* There is no evidence that the CPUSA AOR Agreement is enforceable against Unilever. Cairns further testified that she renegotiated the Unilever agreement with Steven Armstrong of Unilever at the end of 2001 but that agreement was never signed. 2T:92-93.

---

[2] Plaintiff's Exhibits are designated as "PX __." Defendant's Exhibits are designated as "DX __."

## C.    Public Relations

Public relations is one of several methods of communication that is available to convey a message to consumers.  Pretrial Order, Undisputed Facts ¶ 5.  Other methods include advertising, consumer promotions, Internet, direct, event, radio, and special markets.  *Id.*  Each of these methods is known as a "channel" of communication.  *Id.*  There are two parts to a public relations campaign: (1) planning and (2) program execution.  *Id.* at ¶ 6.  Planning is an iterative, creative process wherein Debtor would develop public relations programs and concepts for presentation to the Brands for potential expansion, acceptance and/or approval.  3T:110:20-112:4; 4T:126:10-24. Planning is usually conducted in the year prior to the execution of the program.  Pretrial Order, Undisputed Facts ¶ 7.  For example, planning for a program that is executed in the calendar year 2002 would ordinarily be performed in 2001.  Pretrial Order, Undisputed Facts ¶ 8.  Program execution is the implementation phase of an approved plan or campaign.  Pretrial Order, Undisputed Facts ¶ 8.

## D.    The Brands' Programs and Budgets

Toward the end of the first quarter of each calendar year, the Brands briefed the Debtor on their marketing strategies, objectives and anticipated budgets for the following calendar year.   3T:240:17-241:7; 4T:124:7-125:23.  Based on the strategies, objectives and budget parameters presented by each Brand, the Debtor would endeavor to develop (i.e., plan) proposed public relations concepts and programs for the Brands to consider for potential approval and, ultimately, for execution.  3T:244:3-245:2.  During the planning process the Debtor would develop its work product for potential presentation to the Brands.  3T:111:15-112:4; 3T:247:7-11.  Without the effort expended on planning, the

Debtor would not have any concepts and/or program ideas to propose to the Brands. 3T:247:19-21.

In connection with its presentation of proposed programs, the Debtor provided a breakdown of the Brand's anticipated public relations budget as envisioned by the Debtor.  3T:244:3-245:2.  The Debtor's proposed budgets were based upon its own, internal estimates of the amount of manpower and expenses that each element of a program would cost Unilever for execution.  3T:245:3-15.  The Brands were not obligated to accept and/or execute Debtor's proposed programs and budget and could accept and/or reject them in whole or in part.  3T:244:3-13; T4:129:11-130:5 ("It's not a guarantee that we'll buy the program, because of course, you wouldn't buy something sight unseen.").

The Debtor acknowledged that the preliminary budgets identified by the Brands were not guaranteed to be paid to Debtor, but payment was dependent upon approval of a program and execution.  3T:104:2-19; 3T:105:9-13 ("We don't get to bill the money until the program is approved because we have to put the budget together based on the creative content of the program.").  The amount budgeted to compensate Debtor for planning (i.e., $15,000) was fixed by the budget for the year in which planning was taking place. 4T:129:8-130:5.  For $15,000, Debtor was expected to come up with a feasible public relations program based on the anticipated budget identified by the Brand.  4T:129:18-131:8.

Once a program was approved, the Debtor invoiced Unilever for manpower (or fees) based upon the agreed budgets.  Pre-trial Order, Undisputed Facts ¶ 44.  In the event that a proposed concept or plan was not accepted, Unilever had not agreed to compensate

the Debtor for its efforts beyond the amount allocated for planning in the previous year's

budget. 4T:132:3-10. The Debtor also prepared "budget trackers" that were sent to the

Brands, reflecting the agreed upon budgets, amounts pre-paid by Unilever, amounts

earned (or spent) to date, and amounts remaining in the budgets. 3T:116:17-117:4; *see

also* DX 235 at CA 0012828; PX 313.

**E.      Communications Channel Planning Is Introduced By Unilever**

Prior to 2001, planning began with the Debtor being briefed by the client. 1T:24-

25. During the briefing, the client explained its mission for the following year, what

market conditions may have changed, what they want to achieve and what the budget

amount would be. *Id.* The Debtor would then research, create and write a plan, and

present it to the client. *Id.* Prior to 2001, the Debtor would do that independently at the

agency. *Id.* The Debtor charged a flat fee of $15,000 for planning prior to 2001. 1T:25.

Communication channel planning ("CCP") was a new planning process created

by Unilever and introduced in 2001. 1T:26. Under CCP, the different "channels" are

brought together for planning. *Id.* The channels include advertising, public relations,

promotions, media, Hispanic, direct, and other agencies. *Id.* The purpose of this process

was to have all the agencies adopt a coordinated message so that the consumer receives a

single message about the brand. *Id.*

A manual for CCP was provided to the Debtor in 2001. 1T:27-28; PX-504.

Unilever anticipated the planning of the CCP would include attending planning meetings

and whatever the scope of those meetings entailed, briefing, participating in creative

exercise, brainstorming, preparing preparations, researching, attending internal and

7

external meetings, caucusing with other agencies, having redirection, taking feedback and retooling a plan.  PX 506 pp. 111-12.

The CCP manual states that participation by the agencies in CCP was "mandatory," and the Debtor and other agencies working on Snuggles, Pond's and VICL were told at a kick-off meeting in 2001 that CCP was mandatory.  1T:29-31; PX-504. The CCP manual provided timelines for completion of various parts of the planning. 1T:31-32; PX-504.  By the end of June of the planning year, the agencies were to arrive at an agreed activation platform.  *Id.*  Under CCP, planning could become a lengthy and complex process, requiring many meetings.  1T:36.  The Debtor was well aware from the start how time consuming the planning process may become.  In an e-mail by Cairns to Kalindi Patel of Unilever she stated:

> [W]hat we refer to as 'Planning' under Unbilled Overtime, is the Unilever HPC/CCP process, and as I explained can vary dramatically from one brand to another.  The process can encompass multiple days of channel group meetings, core team strategy meetings separate from group sessions, competitive research, consumer immersion projects, creative research and inter-channel group brainstorming sessions, at-home agency brainstorming sessions, preparation and presentation of thought documents, offsite ideation days, etc. all the way through to the final creation and presentation of the agency's own PR campaign, program and detailed budget for the brand.  In our agency this latter part alone can easily account for 200 hrs.

*See* DX 71.

CCP was first implemented in 2001 for 2002 execution.  1T:39.  In 2001, Unilever set a fee for CCP planning at $15,000 per year. 6T:37; DX-12.  The $15,000 planning fee was only imposed upon PR agencies and not other agencies.  5T:38-39. 16. The Debtor understood from the outset that through CCP they would be paid a $15,000 flat fee.  In an e-mail by Cairns to Kalindi Patel of Unilever she stated:

> For this effort an agency is paid $15,000.00 total and cannot exceed
> $5,000 in out-of-pocket expense . . . . In rare cases, when CCP is
> particularly lengthy (as in Snuggle and Pond's), an agency can request
> additional funding, although it is not really encouraged.

DX 71; *see also* DX 64 (Cairns: "Cairns has spent an excessive amount of hours in planning whereas *we are limited to a $15,000.00 billing cap on manpower* . . . . Cairns is expected to spend hefty manpower hours to fulfill Unilever Admin requirements which are not included in the Brand Budgets . . . .") (emphasis added); PX 504. CCP also required that the Debtor match the $15,000 for planning imposed by the planning department. DX 12. Cairns understood this to mean that if Unilever paid $15,000 of time, then agencies were required to donate another $15,000 of time as a match, *see* 1T:56; *see also* 5T:41, and that the matching component of CCP was new to the planning process, *see* 1T:56.

## F.    Non-Production Items

In 2002 and 2003, a Unilever procurement team referred to as the Non-Production Items group implemented an initiative, generally known as "NPI," to reduce costs to Unilever businesses that were not directly part of the production of Unilever's products. 5T:8:8-19. NPI was being introduced across Unilever's marketing services, but as of 2003 it had not been fully implemented to public relations agencies. 5T:11:1-14. Whereas agency compensation, prior to the introduction of NPI, was informal, NPI presented a "more structured approach" that created transparency, so that Unilever knew "what everyone was paying and everyone was getting." 5T:15:12-16:12. Before NPI, public relations agencies conducted planning to develop a program for potential execution. 5T:16:13-17:18. The agencies, however, were paid for the execution of the

program, so they "made up" for the work that went into planning by building it "into the execution costs."  *Id.*

Beginning in 2001 Unilever required Cairns to provide information on non-production items, including the identities of individuals working on the dedicated teams for the brand and their hourly billing rate.  1T:41-42.  The hourly billing rates were determined by taking the salary, overhead and profit and dividing by 1,900 hours worked to arrive at a billing rate.  1T:41-43.  Cairns began submitting NPI information to Unilever in 2001.  1T:43.  However, the Debtor was never ultimately hired or retained as part of the NPI program.  3T:108:24-109:4.   Thus, Unilever never approved the hourly rates submitted by Debtor.  3T:85:23-86:1; 3T:86:5-7.

## G.    Snuggle CCP for 2003

Snuggle is a brand name for a fabric softener.  1T:52.  The Debtor began working for the Snuggle Brand in 1999.  1T:52.  Planning for Snuggle 2003 kicked off on March 12, 2002.  1T:61; PX-269.  In 2002, Snuggle authorized a planning fee of $15,000 to be paid to Debtor for developing the Snuggle 2003 program.  Pretrial Order, Undisputed Facts ¶ 48.  The budget for Snuggle for the 2003 program execution was set at $1.2 million.  1T:53.[3]  Snuggle planning was to be completed by June 2002, but this deadline was not met.  1T:62-63; PX-269.

### 1.   The Claim For 2003 Planning Manpower

Planning for Snuggle 2003 did not go as originally planned.  During the planning phase in 2002, the Debtor generated a number of concepts and/or program proposals that Snuggle did not believe were consistent with the Brand's communications objectives.

---

[3]      The budget for Snuggle 2002 reflected the $15,000 planning fee.  DX 23 (i.e., program development).  The Debtor invoiced Snuggle for the $15,000 planning fee, and it was paid by Unilever.  3T:120:2-4.

For example, one proposal was recycled from a previous program, one proposal involved colored fountains that did not relate to the Brand's message, and another proposal was to pump the chemical scent of Snuggle into the subway vents in Grand Central Station. 4T:135:14-136:23.  Due to the difficulty the Brand was experiencing getting to a viable program, Snuggle changed direction and re-briefed the Debtor.  4T:136:12-14.

After exceeding the amount that had been allotted for planning, Debtor informed Snuggle that it was over the planning budget.  PX 471.  During 2002, the Debtor had discussions with Stacie Bright of Unilever about the additional amount of time being spent on planning for Snuggle 2003.[4]  On February 3, 2002, Ms. Bright stated that agencies should let a brand know if they could not stay within the $15,000 budget, plus the agency's $15,000 match, and Cairns therefore contacted Unilever when it had trouble staying within the budget.  1T:79-80; DX-12.

Cairns first contacted Unilever about excessive hours being spent on Snuggle 2003 planning in May 2002.  1T:80.   In June of 2002, Cairns was informed by Matt Smith of Unilever that due to some financial issues at Unilever there were going to be cuts.  3T:207-208.  Michelle Nadata, the Debtor's vice president who managed the Debtor's Snuggle team and dealt with the day-to-day client relationship, *see* 3T:202, did an analysis of the time that had been spent on planning to that point, *see* 3T:207-208. Ms. Nadata determined that the Debtor had expended $39,000.00 in planning time in excess of the budget.  3T:208.  She communicated this fact to Matt Smith of Unilever via e-mail on June 5, 2002.  *Id.*  In response to Ms. Nadata's June 5, 2002 e-mail, Unilever paid an additional $30,000.00 towards 2003 CCP.  1T:80.  After the $30,000.00 payment

---

[4]        Stacie Bright was the PR manager for home and personal care products, which included Snuggles, Pond's and VICL.  1T:35-36.

in June 2002, Cairns made an additional request for payment due to the continuing

excessive amounts of time being spent on CCP. 1T:80-81. On June 25, 2002, the

Snuggle Brand and Debtor had a conference call to address, *inter alia*, the budget for

Snuggle 2003. DX 247. During the conference call, the Snuggle Brand reiterated the

Unilever policy that "agencies should only be compensated $15-20,000 for their work

during the planning process." DX 247 at 2. Consequently, Snuggle was "unable to pay

[Debtor] the entire amount proposed based on manpower hours assessed." *Id.* (emphasis

added).

In response to the Debtor's request for additional payment after June of 2002,

Unilever told the Debtor that there was a $1.2 million budget in place and that there

would soon be an approved plan to go forward. These assurances came from Matt

Smith, who spoke to Annemarie Cairns and Michelle Nadata. 1T:83. Although Debtor

contends that Smith assured Debtor that the budget for Snuggle 2003 was $1.2 million,

(1T:83:4-18), Nadata admitted that -- as early as February 2003 (i.e., before budgets were

cut) -- Smith conveyed to her that he felt as though he had accommodated the Debtor and

already paid it for all planning. 3T:267:1-5. Indeed, when Nadata addressed the 2003

Snuggle budget with Maria Chan of Unilever after the budget cuts, she did not mention

anything about Smith making any assurances that Debtor would be paid for the time that

it allegedly expended planning Snuggle 2003. PX 6; 3T:264:3-265:15. Nadata also

admitted that Smith never guaranteed or agreed with Debtor that it would be paid for its

planning time, but merely suggested there was the potential to make money for work to

be performed in the future. 3T:236:10-16; 3T:272:25-273:5 (Q: [Smith] was trying to

encourage you and based on saying, look, next year it looks like we have a good budget,

you guys know if you get back into the planning cycle, next year you might be able to make some money?  A:  That was . . . yes.") (emphasis added).

In an e-mail that Cairns sent to Helena Minsk, Smith's supervisor, concerning losses on Snuggle 2003 and a way to move forward, there is no indication whatever that Smith made any commitment to Debtor concerning compensation for the planning manpower it allegedly expended.  DX 74; *see also* DX 112 at 2 ("based on last agreement, we were to make up the penalizing shortfall [from 02/03] by proper compensation going forward") (emphasis added).  Minsk -- who had overall responsibility for Snuggle -- was never informed of any such commitment by Smith. 4T:158:9-15; 4T:159:1-3.  Despite pre-marking volumes of e-mails (Pretrial Order, Plaintiff's Exhibit List pp. 52-71) and having numerous memoranda directly relating to the Snuggle 2003 budget, Cairns admitted that Debtor does not have any writing to or from Smith indicating that Debtor would be paid for all of the manpower allegedly expended on Snuggle 2003 planning.  3T:129:8-12.  Ultimately, the Debtor agreed to accept a "bottom line loss" on Snuggle 2003 provided that it would be relieved of the CCP planning cycle on Snuggle 2004.  DX 74 at 2 ("If you can relieve us of this burden - - I'll work out how to survive this loss and keep going until '04 starts").

Recognizing that Debtor expended significant time on planning "over and beyond the funds allocated for specific PR programs," Snuggle suggested the creation of a retainer for that manpower.  DX 247 at 2.

2.    The $75,000 Retainer Claim For 2004 Snuggle Planning

To address Debtor's concerns regarding prospective compensation, Unilever's Holland informed Debtor that Unilever's Public Relations group was working on

developing a retainer whereby Unilever would pay the Debtor $75,000 in 2003 for

planning Snuggle 2004.  4T:144:17-146:17.  Further, in accordance with Debtor's prior

request, Unilever agreed that the Debtor was not to be brought into planning Snuggle

2004 until CCP had advanced to the point that the Brand had settled on its strategy.  PX

121; 4T:145:24-146:2.

Although Debtor invoiced Snuggle for $75,000 for 2004 planning, other than

attending one meeting, Debtor was not engaged in Snuggle 2004 planning.  *See* DX 121

("We told her in June that we would not call on her to participate in 2004 planning until

we were further along, so as not to waste her time and resource. . . .  I believe Cairns (not

AMC) attended one (1) meeting of maybe two hours back in May/June and have not

participated since."); DX 245 ("agency has not been briefed for '04 and without any

information or insight re [sic] brand activities or agency input required could not really be

expected to submit meaningful ideas . . ." agency did not have "any exposure to Snuggle

since last summer! . . .  Agency awaiting briefing, any requests re [sic] creative/strategic

assignments").

On October 24, 2003, the Debtor met with Bright and Michael Murphy, Holland's

former supervisor and Unilever's Vice President of Integrated Marketing Services, to

address concerns about compensation and Debtor's transition to NPI.  Pretrial Order,

Undisputed Facts ¶ 24; 5T:19:7-26:25; DX 236.  Murphy testified that, during the

October 24th meeting, he suggested that because Snuggle 2004 planning was on hold and

Debtor had not provided any material services toward Snuggle 2004 planning, rather than

paying Debtor's invoices for $75,000, Murphy proposed that $5,000 was appropriate.

5T:24:18-25:20.  Following that meeting, Debtor, in fact, issued an invoice for $5,000.

Cairns testified that the $5,000 was not paid, but Debtor has not presented a claim on that invoice.  1T:108:15-21.

      3.      <u>The $125,000 Retainer Claim For 2004 Snuggle Planning</u>

At the October 24, 2003 meeting, Murphy also outlined a structure for compensating Debtor for Snuggle 2004.  DX 236 at 6.  On November 25, 2003, Murphy sent Debtor an e-mail outlining a $125,000 retainer for planning and on-going counsel.  PX 36.  Murphy testified that his November 25, 2003 e-mail was intended to provide an interim compensation structure for Debtor as it transitioned to the NPI process.  5T:29:11-24.  In contrast to Debtor's former compensation structure, Murphy explained that a "retainer is not dependent upon the execution of an actual program."  5T:35:8-18.  Thus, even if Unilever made budget cuts, the funds earmarked to be paid as a retainer would not be retrievable.  *Id.*

The Debtor did not immediately accept the retainer offer at the meeting.  5T:35:19-36:4.   Instead, the Debtor requested clarification of the terms for the retainer being suggested in Murphy's November 25, 2003 e-mail.  DX 166.  Minsk responded to Debtor's e-mail and stated that her understanding regarding Murphy's November 25, 2003 e-mail was as follows:  "Last I discussed with Michael Murphy, the amount was being negotiated and nothing had been finalized.  I assume that is why in the first three months of 2004, no PR work has been done on Snuggle's behalf and no bills have been submitted."  DX 166 (emphasis added).  This e-mail is just one of many the parties exchanged concerning the terms of the $125,000 retainer.

Ultimately, the Debtor insisted on a written guarantee.  PX 8.  On April 1, 2004, Bright provided the Debtor, by e-mail, with a draft of a letter agreement relating to the

$125,000 retainer. DX 178. Because Bright was departing the next day on vacation, her
e-mail stated, in part, that she was available "[t]onight on cell and tomorrow around until
about noon. Let's discuss if I did not capture something clearly. Dan Hilbert will handle
and sign on my behalf while I am away." 5T:136:6-12; DX 178. Dan Hilbert was
Unilever's Director of Integrated Marketing. The Debtor did not communicate with
Bright before she departed for vacation nor did Debtor contact Bright's supervisor Daniel
Hilbert. 5T:136:13-15; 3T:79:15-18. Instead, Debtor sent an e-mail indicating that the
terms proposed were not those discussed, but Debtor would await Bright's return from
vacation. DX 180.

On April 2, 2004, Dan Hilbert executed a formal letter incorporating Bright's
draft language. Pretrial Order, Undisputed Facts ¶ 28. But before the Debtor and
Unilever could come to terms on the $125,000 retainer the Debtor abruptly resigned the
Snuggle business. PX 498. Debtor's resignation did not give any indication that it was
owed any money by Snuggle and stated, in part:

> Thank you so much for your nice note and generous offer regarding the
> Snuggle business. In the end, although we are most grateful to you,
> Stacie, Helayna and everyone on the brand, we have given the relationship
> much thought and have decided not to pursue this exciting opportunity in
> 2004. . . . We [appreciate] the opportunity you gave us and have nothing
> but great memories of a positive experience and very meaningful
> relationship.

*Id.*

It was not until five months later, after the Debtor was terminated by the Pond's
and VICL brand teams, that Debtor sent an invoice seeking payment for, *inter alia*,
$329,767 for "Unpaid Manpower Planning Fees '03." DX 235 at CA 0012831-2. With
respect to these fees, Cairns admitted that the manpower allegedly expended by the

Debtor on Snuggle 2003 was against the anticipated budget of $1.2 million, but the

Debtor would only collect these fees if there was an approved program.  Complaint ¶ 28;

3T:100:15-101:8; 3T:106:14-18 ("Q:  [Y]ou were doing [planning] because it was your

expectation that you were going to have an approved program to put into action and then

you were going to make this money on the 50/50 split, correct?  A:  Yes.").

## H.      Pond's and VICL

Prior to Debtor's resignation from Snuggle, both Pond's and VICL considered

whether Debtor was the best agency for their Brands.  5T:139:15-140:13.  Both Brands

wanted to do an open bid.  *Id.*; DX 188.  Unilever's Public Relations group counseled

Pond's and VICL against putting their work up for bid, so as not to disrupt the

relationship with Debtor while the Snuggle retainer was being resolved.  5T:142:5-143:3.

In light of Debtor's resignation from Snuggle, however, Pond's and VICL decided to go

forward with an open bid.  5T:143:10-25.

On Friday, April 23, 2004, Bright notified Debtor that Unilever was putting the

Pond's and VICL accounts "up for open bid."  Pretrial Order, Undisputed Facts ¶ 30; DX

204 at 3.  Unilever expressly invited Debtor to participate in the bid for the VICL and

Pond's business.  DX 204.  The Debtor did not accept Unilever's invitation to participate

in the bid.   Instead, Cairns e-mailed Bright claiming to have "met with the team" and

presented 14 questions about the reasons for and structure of the bid, which Cairns

attributed to Debtor's team.  DX 205.  Shortly thereafter Cairns made numerous

telephone calls to Bright's office and cell phone and sent Bright a number of antagonistic

e-mails, which Bright described as threatening and mean.  DX 205; DX 207; DX 208;

DX 210; 5T:147:19-24; 5T:148:15-151:19; 6T:4:23-5:14.[5]

In light of Cairns' pattern of abusive behavior, Unilever decided to bring its

business relationship with Debtor/Cairns to an end.  DX 211; 6T:52:6-15 ("this was a

pattern of behavior . . . this was something that had been going on for years.").

Consequently, on April 27, 2004, Bright directed Debtor to stop all work on the VICL

account.  DX 212.  On April 30, 2004, the Debtor was notified by e-mail from Bright that

its relationship with Pond's and VICL was being terminated.  DX 215.

On or about June 25, 2004, the Debtor submitted a demand for payment of

$98,482.44 in total on both the Pond's and VICL accounts.  At that time, the Debtor

demanded payment for post-termination manpower on Pond's and VICL of $20,000

each.  DX 230.   Thereafter, the Debtor sent Unilever invoices for post-termination

manpower on Pond's and VICL for $15,000 each.  DX 235 at CA 0012813 and CA

0012826.   During the trial, when the Court asked whether the Debtor made a claim for

termination manpower, the Debtor inexplicably failed to identify these invoices.

2T:80:15-81:2.  However, on cross-examination, Annemarie Cairns conceded that had

Unilever paid the foregoing invoices, the Debtor would probably not be seeking

termination fees in this case.  3T:24:1-4.  Moreover, the Debtor admits that, in calculating

the amount it owes Unilever, it has already deducted for costs and manpower expended

---

[5]     These telephone calls and e-mails reflected the poor state of the relationship between Cairns and
Unilever at that time.  Although Unilever acknowledged that Cairns and the Debtor were bright and
creative, it became clear during trial that Cairns lacked any deft touch in client relations, an essential
requirement for any service business.  A review of numerous e-mail exchanges, letters, memoranda and
testimony by Unilever employees and Cairns reflected that dealing with Cairns could be difficult.   The
Court's own observations during Cairns's testimony buttressed this conclusion.  The Court had to direct her
on numerous occasions to answer questions she was asked, without lengthy non-responsive speeches.  She
paid little or no attention to these repeated instructions.  Many of her explanations in the face of rather clear
e-mails or other writings lacked credibility.

post-termination.  *See* Pretrial Order, at 3 ("Cairns admits that Unilever had deposited

certain sums for services and expenses on [Pond's] and VICL in the amount of

$563,428.00.  Of this sum. . . ," amounts were used by Debtor "prior to or *within a short*

*period after the termination*.") (emphasis added).

The Debtor seeks: (i) $96,602.50 for time allegedly expended on Pond's 2004

planning; and (ii) $203,139 for 2004 manpower and 2005 planning.  DX 239, ¶¶ 71, 74.

The Debtor also seeks to recover for additional unbudgeted agency manpower overtime it

performed for Unilever in 2003 including, among others, $58,700.00 for the Beauty

News Center, *see* 2T:41-42;  DX-138, DX-55 and $25,437.50 for More Alpha Awards,

*see* 2T:44;  PX-252.  Agency manpower overtime were incidents where Cairns was

requested to provide additional services.  2T:46-47; DX-55.

With respect to planning the program for Pond's 2004, the planning fee was

$15,000.  Pretrial Order, Undisputed Facts  ¶ 50.  Debtor invoiced Pond's for the $15,000

planning fee.  T3:151:12-21.  Unilever paid Cairns the $15,000 fee for planning the

Pond's 2004 program.  *Id*.;  Pretrial Order, Undisputed Facts  ¶ 51.

With respect to 2004 manpower and 2005 planning for Pond's, the Pond's 2004

budget provided for total manpower fees of $371,000.  That budget included a $39,000

for "Planning 2005/Project Aurora."  DX 235 at CA 0012830.  By the time the parties

stopped doing business, Debtor had invoiced Unilever a total of $311,000 and Unilever

paid Debtor $311,000.   DX 235 at CA 0012830.

With respect to VICL 2004, Debtor seeks $144,105 for 2004 planning.  DX 239, ¶

89.  The VICL 2003 budget allocated a flat fee of $15,000 for planning the VICL 2004

program.  Unilever paid Cairns the $15,000 fee for planning the VICL 2004 program.

DX 45.  By the time that the parties stopped doing business, Debtor had invoiced VICL

$15,000 for the VICL 2004 planning fee, which VICL paid.   DX 45.

The amounts sought by Debtor are all amounts calculated after the parties stopped

doing business and/or amounts in excess of the agreed budget that Debtor could not have

reasonably expected to be compensated for.  DX 235 at CA 0012830, *see also* Ex. A.

Debtor admits as much in documents prepared after being terminated that purport to

calculate Debtor's time relating to its claims on the Pond's Brand.  Debtor states "[i]n the

past . . . [Debtor] regularly provided unbilled manpower . . . [s]ince Unilever terminated

[Debtor] without cause . . . the agency requires all hours for work incurred . . . on Pond's

behalf to be paid, including those heretofore considered non-billable."  DX 55 at 1

(emphasis added); *see also* PX 304 at CON 02930 ("$15,000 pre-termination CCP 'good

faith' protocol offered by Unilever, no longer valid post-termination.").

## I.    Unilever's Counterclaim

Unilever counterclaimed to recover funds that were advanced as pre-paid money

to the Debtor for manpower and out-of-pocket expenses for 2003 and 2004 public

relations programs for Pond's and VICL.  6T:9:16-10:13.  These funds were never used

by Cairns on Unilever's programs.  Instead, these monies were used by Debtor for its

own business operations and Unilever received no benefit from these funds.  3T:199:14-

200:10.  Further, the Debtor has admitted in the Amended Complaint that monies are

owed to Unilever.  DX 239, ¶ 93-95.  There is no dispute that Unilever is owed $406,153

for advances (going back to 2003) that were never returned and are owed to Unilever.  *Id.*

In its counterclaim, Unilever asserted that it is due a setoff for an additional

approximately $100,000 it pre-paid to Cairns, and which Cairns asserts was used as

manpower fees for Pond's and VICL.  6T:9-29.  Unilever's purported proof of additional

monies owed to Unilever from Cairns with regard to the counterclaim, above and beyond

that stipulated in the pretrial Order, was entirely speculation and guess.  6T:9-29.

## III.   DISCUSSION

### A.   Debtor's Claims for Breach of Contract

The Debtor's First, Fifth, Sixth, Seventh and Tenth Causes of Action are for

breach of contract.  Debtor contends that Unilever breached unidentified contracts with

Debtor and owes Debtor various amounts for services allegedly performed on behalf of

the Snuggle, Pond's and VICL Brands.   With respect to these Counts, the Complaint

does not identify a contract, nor the terms of any enforceable contract that were allegedly

breached.  *See* DX 239.  However, the parties proceeded as if this were the underlying

basis of the claim.  After a review of the record, the Court holds that the Debtor has failed

to make a prima facie case for breach of contract, oral or written, on any of these Counts.

To prevail on a claim for breach of contract under New York law, a plaintiff must

prove (1) a contract; (2) performance of the contract by one party; (3) breach by the other

party; and (4) damages.  *Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000).

The dispositive issue with respect to all of these causes of action is whether the Debtor

has established the existence of a contract requiring Unilever to pay for the services

allegedly performed on behalf of the Snuggle, Pond's and VICL Brands.  To establish the

existence of a contract under New York law, a plaintiff must allege an offer, acceptance,

consideration, mutual assent, and intent to be bound.  *Rozsa v. May Davis Group, Inc.*

152 F. Supp.2d 526, 533 (S.D.N.Y. 2001) ("To establish the existence of a contract under

New York law, a plaintiff must allege an offer, acceptance, consideration, mutual assent,

and an intent to be bound."). "For a contract to be binding, the parties' agreement must be definite enough so that the parties' intent can be ascertained with some degree of certainty." *Oscar Productions, Inc. v. Zacharius,* 893 F. Supp. 250, 255 n.3 (S.D.N.Y. 1995) (citing *Candid Productions, Inc. v. Int'l Skating Union,* 530 F. Supp. 1330, 1333 (S.D.N.Y. 1982)). The plaintiff has the burden of establishing all essential terms of the alleged contract, with sufficient definiteness that the Court can interpret its terms. *Oscar Productions,* 893 F. Supp. at 255.

The plaintiff must also establish that there was a meeting of the minds, demonstrating the parties' mutual assent and mutual intent to be bound. *Id.* (citation omitted); *see also May v. Wilcox,* 182 A.D.2d 939, 940 (N.Y. App. Div. 3d Dep't 1992) ("In order to create a binding contract there must be a meeting of the minds as to the essential terms of the agreement."); 22 N.Y. Jur.2d, Contracts § 20 (West 2003) (the "very essence of a contract is definiteness as to material matters."); *Bisk v. Soko Co.,* 98-CV-184, 2000 U.S. Dist. LEXIS 9789, at *15 (N.D.N.Y. July 7, 2000) ("[F]ormation of a binding contract requires 'mutual assent to the terms and conditions thereof.'").

The Court preliminarily notes that where an alleged contract is oral, plaintiff has a particularly heavy burden to establish objective signs of the parties' intent to be bound. *Oscar Productions,* 893 F. Supp. at 255 (citing *Winston v. Mediafare Entm't Corp.,* 777 F.2d 78, 80 (2d Cir.1985)). "The burden is heavier in oral agreements because '[a] primary concern for courts in such disputes is to avoid trapping parties in surprise contractual obligations that they never intended.'" *Id.* (citing *Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 72 (2d Cir. 1989)). "More is needed than agreement on each detail to create a binding obligation. There must be overall agreement . . . to enter

into the binding contract." *Id.* With these principles in mind, the Debtor's First, Fifth, Sixth, Seventh and Tenth Causes of Action will be addressed in turn.

Count One asserts that at the request and with the knowledge of Unilever, the Debtor performed 1,936.9 hours of work for planning on the 2003 Snuggle campaign at a net cost of $404,766.75 and that $329,766.75 of that amount remains due and owing from Unilever. *See* DX 239 at ¶ 56. As discussed above, pursuant to the parties' contract Unilever agreed to pay to the Debtor a $15,000 flat fee per year for CCP planning. The parties' contract was comprised of the agreed upon budgets, *see* 3T:245:25-246:7, and further evidenced by the written communications between the parties, *see* DX 71; DX 64. Given that Cairns admitted that the Debtor does not have any writing to or from Unilever indicating that Debtor would be paid for all of the manpower allegedly expended on Snuggle 2003 planning in excess of the $15,000 flat fee, *see* 3T:129:8-12, the Debtor has a particularly heavy burden to establish objective signs of Unilever's intent to be contractually bound for additional services performed on the 2003 Snuggle campaign.

The record reflects that there was no oral agreement by Unilever to compensate the Debtor for services performed above and beyond the $15,000 allotted amount. Rather, Ms. Bright stated that agencies should let a brand know if they could not stay within the $15,000 budget plus a $15,000 match. 1T:79-80; DX-12. Although Unilever paid an additional $30,000.00 towards 2003 Snuggle CCP, *see* 1T:80, this does not establish an oral contract by Unliver to pay the Debtor for all services performed above and beyond the $15,000 allotted amount. It is clear that the $30,000.00 towards Snuggle 2003 was an accommodation by Unilever.

Further, the fact that Unilever told the Debtor that there was a $1.2 million budget in place and that there would soon be an approved plan to go forward does not establish that there was an oral agreement to compensate the Debtor for the additional services performed. Rather, Nadata admitted that Smith of Unilever merely suggested there was the potential to make money for work to be performed in the future. Indeed, the testimony of Nadata reflects that Smith of Unilever did not give any assurances to the Debtor that it would be paid for the time that it allegedly expended planning Snuggle 2003. Given the facts presented, it is clear that the Debtor simply failed to prove, as it must, the existence of a binding oral contract to pay the Debtor for any services over and above those covered by the $15,000 planning fee. For these reasons, the Debtor is not entitled to judgment on Count One.

Count Five asserts that the Debtor performed 477.5 hours of work for 2004 Pond's Planning at a net cost of $111,602.50, no part of which has been paid except the sum of $15,000, leaving a balance of $96,602.50. *See* DX 239 at ¶¶ 70-71. Again, as with Snuggle 2003, the planning fee was $15,000 for Pond's 2004. Pretrial Order, Undisputed Facts ¶ 50. Debtor invoiced Pond's for the $15,000 planning fee and Unilever paid the Debtor the $15,000 fee. 3T:151:12-21; Pretrial Order, Undisputed Facts ¶ 51. As with the Snuggle 2003 campaign, the Debtor has not presented any evidence indicating that there was an agreement, written or oral, by Unilever to compensate the Debtor for services performed above and beyond the $15,000 allotted amount. Given the facts presented, the Debtor has simply failed to prove, as it must, the existence of a binding oral contract. For these reasons, the Debtor is not entitled to judgment on Count Five.

Count Six asserts that the Debtor implemented the Pond's 2004 Program, expending manpower hours amounting to $514,139 inclusive of overtime and 2005 Planning and that $203,639 for 2004 manpower and 2005 planning of that amount remains due and owing from Unilever. *See* DX 239 at ¶¶ 73-74. The Pond's 2004 program budget tracker, DX 138, shows that the Debtor had a deficit, or it had not been compensated, for $203,639 of planning. The Debtor did not present the Court with any evidence that demonstrates that there was a contract, oral or written, between Unilever and the Debtor to pay for the additional $203,639 in services for planning. In fact, Cairns testified that the $203,639 represents overtime that was incurred in the planning phase. 3T:165. Cairns admitted that the Debtor does not bill Unilever for overtime, *id.*, and that Cairns did not bill Unilever for these costs until after the Debtor was "fired." 2T:46:6. Again, the Debtor has fallen far short of carrying its burden of establishing that a contract existed with respect to these additional services. As such, the Debtor is not entitled to judgment on Count Six.

Count Seven asserts that in early January 2004, the Debtor began work on Pond's 2005 "Project Aurora" campaign and devoted a total of 129 hours over the next three months to this project with Unilever's knowledge and consent. The Debtor asserts that $25,185.00 remains due and owing from Unilever, and the fees for these services are included as part of the $203,139 balance set forth in Count Six of the Complaint. *See* DX 239 at ¶¶ 76-77. However, the Pond's 2004 program budget tracker clearly reflects that the budget included $39,000 for "Planning 2005/Project Aurora" and that the Debtor was paid $39,000 by Unilever for these services. DX 138; *see also* DX 235 at CA 0012830. Under such circumstances, the Debtor is not entitled to judgment on Count Seven.

Count Ten asserts that Unilver is responsible to the Debtor for the 720 hours of manpower to the VICL 2004 Planning campaign in the amount of $159,105, no part of which has been paid except the sum of $15,000, leaving a balance due and owing of $144,105. *See* DX 239 at ¶¶ 85-89. As with Snuggle and Pond's, the VICL 2003 budget allocated a flat fee of $15,000 for planning the VICL 2004 program. Unilever paid Cairns the $15,000 fee for planning the VICL 2004 program. DX 45. By the time that the parties stopped doing business, Debtor had invoiced VICL $15,000 for the VICL 2004 planning fee, which VICL paid. DX 45. The Debtor has not presented any evidence indicating that there was an agreement, written or oral, by Unilever to compensate the Debtor for services performed above and beyond the $15,000 allotted amount. Given the facts presented, the Debtor has simply failed to prove, as it must, the existence of a binding oral contract to pay the amount in excess of the fixed planning fee. For these reasons, the Debtor is not entitled to judgment on Count Ten.

In the Pretrial Order, the Debtor also contends that it is owed $125,000 pursuant to a "retainer" agreement for Snuggle 2004.[6] As discussed above, Murphy from Unilever outlined a structure for compensating Debtor for Snuggle 2004, *see* DX 236 at 6, namely a $125,000 retainer for planning and on-going counsel, *see* PX 36. Thus, the Debtor established that Unilever made an offer to pay the Debtor a $125,000 retainer for planning and on-going counsel. However, the record makes clear that the Debtor did not accept Unilever's offer. Indeed, the Debtor requested clarification regarding the terms of the retainer and at one point even insisted that the agreement be put in writing. The

---

[6]    This claim is not set forth in the Complaint.

Debtor has failed to show that the parties reached an agreement with respect to the retainer.  For these reasons, the Debtor is not entitled to recover the $125,000 retainer.

**B.        Debtor's Claims for Breach of Obligation to Pay Termination Fee**

Counts Nine and Eleven allege that Unilever breached a contractual obligation to pay the Debtor a termination fee in the sum not less than $90,000, for three months manpower for the Pond's 2004 account, and in the sum not less than $120,000, for three months manpower for the VICL 2004 account.  *See* DX 239 at ¶¶ 81-83 and 91, respectively.[7]  Laura Klauberg testified in her deposition that Unilever had a sixty to ninety day notice provision in the contracts it entered into with its agencies, *see* PX 508 at 81-82, which meant that termination would not occur without sixty to ninety days notice, *see id.* at 104-105.   Alternatively, an agency may receive a payment of a termination fee for the sixty or ninety days notice period and forgo having to work through the notice period.  2T:78-80.  The purpose of the payment of the termination fee is to compensate the agency for the cost and work involved in shutting down their relationship with the company, returning records, closing down programs, reconciling the budget, paying the vendors and other events and issues that were already planned.  *Id.*

Cairns testified in her deposition that the ninth and eleventh causes of action were based on the renegotiated agreement with Steven Armstrong at the end of 2001 or beginning of 2002 in which he agreed to a ninety day notice of termination.  *See* 2T:93:12-15.  The record reflects that the parties intended to put the renegotiated agreement in writing, including a termination fee for a 90 day notice period, but that agreement was never signed.  *See* 2T:92-93.  Therefore, the only basis for Cairns claim

---

[7]        Again, both Counts Nine and Eleven of the Complaint do not make reference to a contract.  The parties proceeded as if breach of contract served as the basis of the claims.

for a termination fee is an alleged oral agreement she had with Steven Armstrong of

Unilever that arose from a conversation they had around that same period of time.  *See*

2T:94:10-12.

As discussed above, where an alleged contract is oral, the Debtor has a

particularly heavy burden to establish objective signs of the parties' intent to be bound.

Here, the Debtor provided few if any details with respect to parties' oral agreement to pay

the Debtor a termination fee arising from the "conversation" with Steven Armstrong of

Unilever.  *See* 2T:94:10-12.  Certainly, a Court cannot begin to decipher the intentions of

the parties with respect to this agreement.  The Debtor has simply not carried its burden

of establishing all essential terms of the alleged contract, with sufficient definiteness that

the Court can interpret its terms.  As such, the Court cannot conclude that there is legally

enforceable contract.  *See Brookhaven Housing Coal. v. Solomon*, 583 F.2d 584, 593 (2d

Cir. 1978) (stating that where the "essential terms of an agreement are omitted or are

phrased in too indefinite a manner, no legally enforceable contract will result.").

Further, the Debtor is also not entitled to separation fees for Pond's and VICL

based on the custom and practice of Unilever with respect to the Debtor because

"industry custom and usage or a prior course of dealing between the parties . . . cannot

create a contract where there has been no agreement by the parties."  *See Granite*

*Partners, L.P. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 96 Civ. 7874 (RWS), 2002

U.S. Dist. LEXIS 17813, at *25 (S.D.N.Y. Sept. 20, 2002) (internal citations omitted);

*Santiago v. Owens-Illinois, Inc.*, No. 05-cv-405, 2007 WL 766235, at *6-7 (D. Conn.

2007) ("[A]bsent evidence of a contractual commitment, policies or practices cannot

form the basis for a breach of contract claim.").  The fact that Unilever previously paid

Debtor money pursuant to an unrelated Transition Agreement that was executed years earlier for different brands and contained mutual releases did not establish a "policy" or "practice" by which Unilever unilaterally obligated itself to pay a termination fee if a relationship with a vendor ends. *Fasolino Foods Co. v. Banca Nazionale Del Lavoro*, 761 F. Supp. 1010, 1021 (S.D.N.Y. 1991) ("[A] prior course of dealings between the parties is a tool for interpreting existing contracts and may not be used to establish contract formation."). The Transition Agreement was in settlement of claims relating to hair care brands Finesse and Thermasilk, involved different individuals at Unilever, and was unrelated to the instant action and had nothing to do with Debtor's work for the Pond's and VICL Brands. Indeed, Debtor has referred to the fee as a "settlement payment." T3:16:22-17:4. Ultimately, the facts do not establish that it was customary for Unilever to pay termination fees to the Debtor.

Finally, even if the Court were find that Unilever and the Debtor agreed upon a sixty days' notice provision or the payment of a termination fee for that period of time, the Debtor has failed to establish the amount of the fee it is owed or any actual damages that it suffered by any failure to receive notice. At one point, the Debtor demanded payment for post-termination manpower on Pond's and VICL of $20,000 each, *see* DX 230, then later sent invoices for this manpower for $15,000 each, *see* DX 235 at CA 0012813 and CA 0012826. The record also reflects that the Debtor may have been compensated for the manpower spent post-termination. *See* Pretrial Order, at p. 3 ("Cairns admits that Unilever had deposited certain sums for services and expenses on [Pond's] and VICL in the amount of $563,428.00. Of this sum . . ." amounts were used by Debtor "prior to or within a short period after the termination."). The conflicting

invoices along with the Debtor's admission that it had been compensated, at least in part, for the services, leads this Court to conclude that the Debtor's estimate of the fee that it is owed is based on pure speculation.

In sum, the Debtor has failed to prove that Unilever breached a contractual obligation to pay Debtor a termination fee when it ended Debtor's representation of Pond's and VICL, or that it was customary for Unilever to pay such fees, or that the Debtor suffered any actual damages by the failure to receive notice.  For these reasons, the Debtor is not entitled to judgment on Counts Nine and Eleven.

### C.   <u>Debtor's Claims for Quantum Meruit</u>

The Debtor's Second and Eighth Causes of Action allege claims for quantum meruit by alleging that Unilever agreed to and accepted Debtor's services in the amount of $329,766.75 for Snuggle 2003 Planning and in the amount of $203,139 for Pond's 2004 and 2005 Planning.  *See* DX 239 at ¶¶ 59-60 and 79, respectively.[8]  In its Pretrial Order the Debtor also states that it is seeking to recover for additional unbudgeted agency manpower overtime it performed for Unilever in 2003 including, among others, $58,700.00 for the Beauty News Center, *see* 2T:41-42;  DX-138, DX-55 and $25,437.50 for More Alpha Awards, *see* 2T:44;  PX-252.  Unilever contends that the Debtor is precluded from recovering on a theory of quantum meruit because (1) the parties had agreed to the compensation which Debtor would receive and (2) Cairns failed to establish the reasonable value of services allegedly rendered to Unilever.

---

[8]        The Debtor in the Pretrial Order raised the issue whether Unilever must pay Cairns the reasonable value of the services Cairns provided to Unilever for the VICL 2004 planning.  This claim was not set forth in the Complaint.  Even assuming *arguendo* that the Debtor preserved this claim in the Pretrial Order, the Court would deny compensation for these services under a theory of quantum meruit for the same reasons it is denying compensation for Snuggle 2003 Planning and for Pond's 2004 and 2005 Planning.

Under New York law, a promise to pay for services is sometimes implied by law under the doctrine of quantum meruit, but this is done only when the court can see that the services were rendered under such circumstances as authorized the party performing to entertain a reasonable expectation of their payment by the party soliciting the performance. *U.S. v. Raymond & Whitcomb Co.*, 53 F. Supp.2d 436, 444 (S.D.N.Y. 1999). However, "the existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Integral Control Systems Corp. v. Consolidated Edison Co. of New York*, 990 F. Supp. 295, 303 (S.D.N.Y. 1998).

A plaintiff seeking to establish a claim in quantum meruit must prove (1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services. *Kreiss v. McCown DeLeeuw & Co.*, 37 F. Supp.2d 294 (S.D.N.Y. 1999). Plaintiff must establish its claim only by a fair preponderance of the evidence. *Sawyer v. Wilcox Estate*, 16 Misc. 2d 429, 431 (N.Y. Sur. Ct. 1959); *Weinreich v. Sandhaus*, 850 F. Supp. 1169, 1183 (S.D.N.Y. 1994) ("Plaintiff bears the burden of proof in quantum meruit actions.").

Here, the Debtor may not recover in quantum meruit for the Debtor's services in the amount of $329,766.75 for Snuggle 2003 Planning and in the amount of $203,139 for Pond's 2004 and 2005 Planning because the parties explicitly agreed to the compensation the Debtor would receive for all of its planning services. *See Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 385 (N.Y. App. Div. 1987) (a quasi contractual obligation is one imposed by law where there has been no agreement or expression of

assent on the part of either party involved).  Further, it was not reasonable for the Debtor to expect compensation for services in excess of the $15,000 planning fee.  From the outset the Debtor was put on notice that payment for additional services would not be forthcoming.

For example, on June 25, 2002, the Snuggle Brand and Debtor had a conference call to address, *inter alia*, the budget for Snuggle 2003. The Snuggle Brand reiterated the Unilever policy that "agencies should only be compensated $15-20,000 for their work during the planning process" and that Snuggle was "unable to pay [Debtor] the entire amount proposed based on manpower hours assessed." DX 247.  Similarly, there was also an agreed upon planning fee of $15,000 for Pond's 2004 and 2005 Planning.  Again, in light of the fact that the parties had an agreed upon $15,000 planning fee for each of the Brands and Unilever's reiteration of its policy with respect to compensation for additional services, the Debtor cannot seek to recover the additional fees on a theory of quantum meruit.  As such, the Debtor cannot recover under either Count Two or Eight.

As for additional unbudgeted agency manpower overtime it performed for Unilever in 2003 including, among others, $58,700.00 for the Beauty News Center and $25,437.50 for More Alpha Awards, the Debtor has not established that these fees can be compensated under the theory of quantum meruit.  For example, the evidence shows that compensation for Beauty News Center was a budgeted item. *See* DX 138.  As such, these fees were included in the agreed upon $15,000 flat fee.  Similarly, the Debtor failed to establish the "reasonable value" of the services it provided for More Alpha Awards and other unbudgeted agency manpower overtime.  All the Debtor submitted into evidence was a memorandum prepared by Cairns to try and collect some of the monies

that the Debtor claimed was owing.  2T:27; DX 55.  The memorandum merely states that

$25,437.50 is owed to the Debtor and itemizes the number of hours that were performed

by the individuals that worked on this project.  *See* DX 55.  This memorandum is not

competent evidence of the work performed by others and falls far short of proving the

reasonableness of the unbudgeted overtime hours.  Not only was this memorandum

prepared after the Debtor was "terminated," *see* 2T:27, but it fails to describe the services

actually performed.  The underlying business records that might substantiate this claim

were not introduced into evidence.  *See* T4:217:10-18; T3:248:1-249:10 ("Q.  On direct

you testified that in addition to keeping timesheets you kept a detailed log.  A.  Yeah.  Q.

Where is that detailed log?  A.  Well, when I left Cairns in '05, I literally threw out 10

years worth of notebooks.  Q.  Did you keep any of them?  A.  No, I left the agency. . .

Q.  [A]t the time that you left Cairns & Associates, were you aware that Cairns had

commenced this lawsuit?  A.  I think I was.  I don't remember the exact time, but I know

this has been going on for a while.  Q.  Okay.  You did just say a few minutes ago, when

you left you threw out -- was it 10 years of notebooks?  A.  I did.  Q.  Okay.  That was --

that was while the lawsuit was pending, correct?  A.  If I was aware of it, I -- if it was

pending then, then yes.").  Further, the record is clear that the Debtor's own time records

were not contemporaneously kept and are fraught with inaccuracies.  For these reasons,

the Debtor's claim for quantum meruit on the unbudgeted fees must fail.

**D.**     **Debtor's Claims for Promissory Estoppel**

Counts Three and Four allege claims sounding in promissory estoppel based on

negotiations relating to the Snuggle account for calendar year 2004.  *See* DX 239 at ¶¶

62-64 and 66-68, respectively.  The Debtor contends that on June 20, 2003, Michelle

Holland promised to pay Cairns the sum of $75,000 for 2004 Planning work done and to be done on the Snuggle account and that the Debtor relied on this promise to its detriment. *Id.* at ¶¶ 62-64.[9]   Similarly, the Debtor contends that on November 25, 2003, Michael Murphy agreed to pay Cairns a "retainer" of $125,000 for 2004 Planning and that the Debtor relied on this promise. *Id.* at ¶¶ 66-68.  Unilever contends that the Debtor is precluded from recovering on a theory of promissory estoppel because the Debtor cannot prove that there was a clear and unambiguous promise.

Under New York law, to recover under a claim for promissory estoppel, the existence of a contract is not needed nor the particulars of consideration in the classic sense. *LAHR Const. Corp. v. J. Kozel & Son, Inc.*, 168 Misc.2d 759, 761-62 (N.Y. Sup. Ct. 1996); *Guggenheimer v. Bernstein Litowitz Berger & Grossmann LLP*, 11 Misc.3d 926, 933-34 (N.Y. Sup. Ct. 2006).  A promissory estoppel action arises out of a breached promise in circumstances where it is fair to hold the promisor to the terms of his promise. *Id.* (citing RESTATEMENT (SECOND) OF CONTRACTS § 90(1) (1981)).

Under New York law, to establish a viable cause of action sounding in promissory estoppel, the third cause of action, a plaintiff must allege (1) an oral promise that is sufficiently clear and unambiguous, (2) reasonable and foreseeable reliance on the promise by a party, and (3) an injury caused by the reliance.  *Rogers v. Town of Islip*, 230 A.D.2d 727 (N.Y. App. Div. 1996); *Guggenheimer*, 11 Misc.3d at 933-34; *Clifford R. Gray, Inc. v. LeChase Const. Services, LLC*, 819 N.Y.S.2d 182, 186 (N.Y. App. Div.

---

[9]      In the Pretrial Order the Debtor demands payment of $75,000 on the Third Cause of Action, but the Amended Complaint and Holland's testimony suggest that $45,000 may be the appropriate amount. *Compare* Pretrial Order, at 2 with DX 239.  After reviewing the record, the Court finds that the $75,000 is the correct amount.  *See, e.g.,* PX 121.

2006) ("A party relying upon promissory estoppel must demonstrate that there was a clear and unambiguous promise upon which it reasonably and detrimentally relied.").

With respect to Count Three, the record is clear that following the 2003 budget cuts, in response to Debtor's concerns about the demands of CCP planning, Unilever's Michelle Holland stated that Unilever was going to pay the Debtor an additional $75,000 planning fee in 2003 for planning Snuggle 2004.  1T:100-101, 1T:107:5-8, PX 121. The Debtor reasonably and foreseeably relied on Holland's promise by performing additional work for Unilever for the period of June through September 2003.  The Debtor invoiced the $75,000 in July but was contacted in August and asked to split the invoice into two invoices, which was accomplished on August 21st.  1T:101; PX-41.  The invoice was re-issued as two invoices on August 25, 2003, but these invoices were not paid. 1T:102; PX-42 and PX-43.  The $75,000 that Unilever was to pay Cairns in 2003 for planning was for work that had been done prior to June 2003, and for additional work for the period of June through September 2003.  3T:28-29.  Unilever thereafter refused to pay the $75,000, and proposed that Cairns be compensated $5,000.00 for planning up through October 24, 2003.  1T:107-108, 5T:24:18-25:20.  The Debtor reluctantly issued the invoice for $5,000, but even that was not paid.  1T:108-15-21.  The Debtor was injured by its reliance on this promise when Unilever refused to pay the $75,000 invoice for the planning fee.  Based on the foregoing facts, the Debtor has established all of the elements that form the basis of a claim for promissory estoppel.  Therefore, the Court holds that the Debtor is entitled to recover on Count Three.

With respect to Count Four, the Debtor contends that on November 25, 2003, Michael Murphy agreed to pay Cairns a "retainer" of $125,000 for 2004 Planning and

that the Debtor relied on this promise. *Id.* at ¶¶ 66-68. However, Unilever correctly contends that the Debtor is precluded from recovering on a theory of promissory estoppel on Count Four because the Debtor cannot prove that there was a clear and unambiguous promise. As discussed above, Murphy from Unilever merely offered to compensate the Debtor for Snuggle 2004, *see* DX 236 at 6, with a $125,000 retainer for planning and on-going counsel, *see* PX 36. There simply was no promise to pay Cairns a $125,000 retainer. Even assuming *arguendo* that this offer constitutes a promise for purposes of this promissory estoppel claim, the Debtor has not established that the promise was clear and unambiguous. Indeed, the record reflects that the Debtor requested clarification of the terms for the $125,000 retainer being suggested. *See, e.g.*, DX 166. For these reasons, the Debtor has failed to establish at least one of the requisite elements on its claim for promissory estoppel. Accordingly, the Debtor cannot recover on Count Four.

### E.    Unilever's Counterclaim[10]

There is no dispute that Unilever is owed $406,153 for advances (going back to 2003) that were never returned and are owed to Unilever. DX 239, 93-95.[11] In its counterclaim, Unilever asserted that it is due a setoff for an additional approximately $100,000 it pre-paid to Cairns, which Cairns asserts was used as manpower fees for Pond's and VICL. 6T:9-29, Pretrial Order, at 3. Unilever's purported proof of additional

---

[10]    In Unilever's Answer to the Complaint, it set forth an additional counterclaim requesting that the Court require the Debtor to return all work product and/or materials for the advertising campaigns for the Unilever's brands, including photographs, negatives, electronic files, videos, and media materials. *See* Answer at ¶ 12 (ECF Doc. No. 12). Unilever preserved this countclaim in the Pretrial Order but did not cite to the Court any authority that would permit the requested relief nor did it present any evidence on this claim at trial. For these reasons, the Court will not grant Unilever the requested relief.

[11]    Count Twelve of the Complaint states that with respect to the VICL account there is due to Unilever from Cairns the net sum of $172,048, which sum should be offset against any sum herein found due by Unilever to Cairns. DX 239 at ¶ 96.

monies owed to Unilever from Cairns with regard to the counterclaim, above and beyond

that stipulated in the Pretrial Order, was entirely speculation and guess.  6T:9-29.[12]  The

only evidence that Unilever offered was the testimony of Stacie Bright, who had no

personal knowledge.  Therefore, objections to her testimony were sustained. 6T:9-27.

Unilever contends it is entitled to setoff for the amounts it is owed pursuant to 11

U.S.C. § 553.  The right of setoff by a creditor is governed by § 553.  It does not create a

right of setoff, but merely preserves the right if it otherwise exists under applicable non-

bankruptcy law.  *In re Bennett Funding Group, Inc.*, 212 B.R. 206, 211 (2d Cir. B.A.P.

1997).  In this case, the applicable law would likely be New York law, which recognizes

both a common law and statutory right of setoff.  *Id.* at 212 (citing *In re Westchester*

*Structures, Inc.*, 181 B.R. 730, 740 (Bankr. S.D.N.Y. 1995)).

A creditor bears the burden of proving a right of setoff and must establish the

following three criteria: (1) the debtor must owe a debt to the creditor which arose

prepetition; (2) the debtor must have a claim against the creditor which arose prepetition;

and (3) the debt and claim must be mutual.  *Id.*  With respect to the requirement that the

debts be mutual, generally, mutual debts are "due to and from the same person in the

same capacity."  *Id.* (quoting *In re Sentinel Prods. Corp., P.I., Inc.,* 192 B.R. 41, 45

(N.D.N.Y. 1996)).  Moreover, mutuality is strictly construed against the party seeking

setoff.  *Id.*  Judge Lifland aptly stated: "a narrow interpretation of mutuality ensures that

setoff is allowed only in situations in which the equitable considerations are strongest:

---

[12]    Unilever's contention that since the Debtor failed to file and serve an answer responsive to
Unilever's Counterclaim seeking more than $550,000 the allegations in Unilever's counterclaim are
deemed admitted pursuant to Fed. R. Civ. P. 8(d) is without merit.  Under Rule 8(d), "[a]verments in a
pleading to which a responsive pleading is required, other than those as to the amount of damage, are
admitted when not denied in the responsive pleading." Fed. R. Civ. P. 8(d).  Thus, averments of damages
are specifically exempted from the effect of Rule 8(d) and are not admitted by a failure to deny.

namely where the claims or debts are owed between the same parties in the same right or capacity." *In re Ionosphere Clubs, Inc.*, 164 B.R. 839, 843 (Bankr. S.D.N.Y. 1994).

Here, both Unilver and the Debtor were obligated to each other on prepetition debts and mutuality existed. A prepetition debt was owed by the Debtor to Unilever by virtue of the $406,153 in advances for manpower and out-of-pocket expenses for 2003 and 2004 public relations programs for Pond's and VICL that were never returned and are owed to Unilever. A prepetition debt was also owed to the Debtor by Unilever for $75,000.00. Thus, these debts are subject to setoff.

## IV.    CONCLUSION

For all of the reasons set forth above, an Order should be entered: (i) against Debtor Cairns & Associates, Inc. on all of Debtor's affirmative claims except for Count Three of the Complaint in the amount of $75,000, for which the Debtor is entitled to recover; and (ii) in favor of Unilever on its Counterclaims for $406,153 less the $75,000 awarded to the Debtor under Count Three.

Also remaining to be resolved is the amount of interest, if any, that Unilever may be entitled to be awarded. Bankruptcy Code § 502(b)(2) precludes a creditor from recovering postpetition interest from an insolvent debtor. *See generally* 4 COLLIER ON BANKRUPTCY ¶ 502.03[3][a] (15th ed. 2007). The Court will leave it to the parties to calculate the interest owing. If the parties are unable to agree on the interest calculation, Unilever shall file an application for interest within 14 days from the date of this decision, and Cairns shall file any opposition within 7 days thereafter.

Unilever shall settle an Order consistent with this Opinion, save for the issue of

interest, within 10 days from the date of this decision.

**DATED:**  New York, New York
August 6, 2007

__/s/ Martin Glenn__
**THE HON. MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**